Glenside, Inc. v. Commissioner.
Glenside, Inc. v. Commissioner
Docket No. 39012.
United States Tax Court
1953 Tax Ct. Memo LEXIS 125; 12 T.C.M. (CCH) 1000; T.C.M. (RIA) 53297; August 31, 1953
Geo. E. H. Goodner, Esq., for the petitioner. James R. McGowan, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax under section 102 of $10,464.62, $12,183.75 and $9,632.83 for the fiscal years ended June 30, 1948, 1949 and 1950. Findings of Fact The petitioner is a corporation organized in 1932. Its corporate returns for the taxable years were filed with the collector of internal revenue for the District of Massachusetts. The business of the petitioner has been the operation of a private mental hospital at 6 Parley Vale, Jamaica Plain, Boston, Massachusetts. It is licensed by the Department of Mental Health of the State of Massachusetts. It derives its income from amounts paid for the care of patients. The hospital was established *126 in 1909 by Mabel Dwyer Ordway, M. D. Dr. Ordway had a degree in psychiatry and neurology. She incorporated the petitioner and owned all of its stock until her death on November 26, 1951 at which time her stock passed to her adopted daughter, Doris M. Horwood. Dr. Ordway was president and treasurer of the petitioner and managed the hospital up to the time she died. She elected as directors, in addition to herself, her daughter, Doris M. Horwood, and Arthur W. Yardley, a certified public accountant whose firm audited the books of the petitioner. The buildings of the petitioner consisted during the taxable years of one modern structure built in 1938 and two remodeled buildings which had formerly been a residence and stable. The latter two were old when remodeled at times not shown by the record. The hospital was regularly inspected by state and local authorities. A report which was given to the petitioner after the state inspections sometimes recommended or directed changes in the physical plant and the petitioner made such changes. The only substantial change made during the taxable years was the construction of two porches completed in 1950 at a cost of $45,000 which increased the *127 capacity by 14 and gave the hospital a capacity of 132 patients. The petitioner, during the taxable years, had no plans to change the location of the hospital, to acquire additional ground, to build any new buildings or to make any other substantial expenditures for plant or equipment except the construction of the two porches mentioned above. Dr. Ordway always had sufficient funds to operate the petitioner and no attempt was ever made on behalf of the petitioner to borrow funds from other sources. The petitioner had an average of about 120 patients during the taxable years. It employed about 50 people, including a dietitian, a cook, technicians and about 40 nurses and doctors. Dr. Ordway owned a residence at Cohasset, Massachusetts. It was not used by the petitioner during the taxable years and for a number of years prior thereto, but the petitioner paid Dr. Ordway $2,400 a year as rent on the house and also paid the taxes, insurance and for minor repairs. Dr. Ordway reecived a salary of $15,000 a year from the petitioner during the taxable years. The following table shows her net income after all deductions and exemptions and the tax paid by her during the calendar years *128 1948 through 1950: Year
Net Income
Tax
1948
$21,938.28
$ 7,275.20
1949
21,676.53
7,195.00
1950
32,042.21
12,509.72 Her assets at the time of her death were worth about $600,000. They included about $80,000 of life insurance, about $25,000 in savings banks, about $175,000 in securities held by a trust of which she was both donor and beneficiary and all of the stock of the petitioner which had a value at that time of about $288,350. The record does not show the net income of the petitioner for the taxable years as determined by the Commissioner but the petitioner on its returns reported gross income, deductions and net income as follows: Fiscal
Year Ended
Gross
Net
June 30
Income
Deductions
Income
1948
$267,071.04
$205,694.95
$61,376.09
1949
282,035.98
210,577.00
71,458.98
1950
267,983.36
211,485.81
56,497.55 The deductions for each year included $2,400 rent on the Cohasset house and other expenses incident thereto. The balance sheets of the petitioner in these returns showed the following: ASSETS
6/30/47
6/30/48
6/30/49
6/30/50
Cash
$ 92,336.08
$138,116.84
$148,028.01
$175,628.09
Receivables less reserve for bad debts
9,484.97
9,690.73
9,602.89
7,866.68
U.S. Treasury notes
500.00
500.00
500.00
500.00
Depreciable assets less reserve
116,764.10
114,087.23
157,291.79
161,740.67
Land
12,687.69
12,687.69
12,687.69
12,687.69
Prepaid insurance
1,703.62
2,366.41
2,411.80
1,736.11
Total
$233,476.46
$277,448.90
$330,522.18
$360,159.24
LIABILITIES
Accounts payable
$ 7,546.92
$ 10,183.08
$ 14,035.82
$ 13,119.75
Payroll
767.71
1,457.53
Reserve for taxes
31,065.40
32,998.00
39,240.00
34,950.00
Common stock (1,000 shares no par value)
15,000.00
15,000.00
15,000.00
15,000.00
Paid-in surplus
1,926.49
1,926.49
1,926.49
1,926.49
Earned surplus
177,169.94
215,883.80
260,319.87
295,163.00
Total
$233,476.46
$277,448.90
$330,522.18
$360,159.24
*129 The depreciable assets on those balance sheets increased from $192,490.72 at the beginning to $248,401.70 at the end of the period and the reserve for depreciation on those assets increased from $75,726.62 at the beginning to $86,661.03 at the end of the period. The petitioner sustained a loss of $444.35 for its first fiscal year and thereafter had net income after taxes for every year of its existence, averaging for the seventeen year period to the end of its last taxable year $17,771.01. The only dividends that were ever paid by the petitioner were $1,500 in 1937 and $5,000 in 1938. The earnings and profits of the petitioner of each of the taxable years were permitted to accumulate beyond the reasonable needs of the business. The petitioner was availed of during each of the taxable years for the purpose of preventing the imposition of the surtax upon its shareholder through the medium of permitting its earnings and profits of those years to accumulate instead of being divided or distributed. The Commissioner determined the deficiencies under section 102 of the Internal Revenue Code. Opinion MURDOCK, Judge: The petitioner had accumulated earnings *130 of $177,169.94 at the beginning of the first taxable year and accumulated additional earnings of $38,713.86, $44,436.07 and $34,843.13 during the three taxable years, so that it had accumulated earnings at the end of that taxable period of $295,163. The Commissioner determined that in each year it was availed of for the purpose of preventing the imposition of the surtax on its sole stockholder through the medium of permitting its earnings of those years to accumulate instead of being distributed. It was incumbent upon the petitioner to show by evidence that the total amount accumulated at the end of each taxable year was reasonably needed in its business. It has failed to make such a showing. Doris M. Horwood, the present owner of the stock of the petitioner, did not express any views of her own or indicate that she was familiar with the financial needs of the business, but testified that Dr. Ordway in conversations with her had mentioned two things which might justify a surplus. One was the possibility that at some idefinite future time more space or a new site for the hospital might have to be obtained. It does not appear that such a need was at all imminent during the taxable *131 years. No investigation or attempt had been made to find new space and the petitioner had no expansion, building or change of location plan under consideration during the taxable years for which it would need the accumulations in question. Doris' testimony suggests that any future move would be to less valuable land and there is no showing that it would involve use of any of the accumulations of the taxable years. This suggestion is much too vague to save the petitioner from tax under section 102. The other was that a depression could be expected after a boom and the business would need funds to carry it through times in which its expenses would exceed its income. She mentioned no amounts and no specific time. Yardley testified that, although his advice in regard to the payment of dividends had been disregarded in the past, he had advised Dr. Ordway against the payment of any dividend during the taxable years because he felt that all earnings were needed for working capital. He defined working capital as the excess of current assets over all liabilities and said that it should equal the operating expenses for a period of "six months - make it four, five, six, seven, eight months, *132 somewhere along in there, is my judgment of the right amount of working capital for this particular type of a business" to carry it through a bad time. Obviously, the petitioner needed some operating capital but the question is - how much did it reasonably need? It had about $65,000 at the beginning of the taxable years. Yardley's statement taken at face value would indicate that the accumulations began to exceed the needs of the business during the taxable years. However, a general opinion of that kind by a director-auditor may be too expansive and assumes importance as its soundness is demonstrated. Yardley did not attempt to fortify his statement by reference to any figures or actual experience of this petitioner. He did not say that any such bad time was then predicted nor did he indicate the extent to which the petitioner might reduce its expenses if bad times came upon it. The history of the business indicates that no great need of that kind existed. The petitioner earned profits averaging $17,771.01 during the last seventeen years of its life up through June 30, 1950 and there is no evidence that the business ever had an unprofitable year except for a $444.35 loss during the *133 first year of the corporation. The fact that the petitioner had practically no investments and so much cash might indicate that it needed the cash to operate but that matter was not gone into in the examination of the witnesses and the Court may not assume much about it in favor of the petitioner which had the burden of proof. The record shows that large cash balances were not maintained in prior years and a fair inference is that the large cash balances of the taxable years included substantial amounts not being used in the business. The record, as a whole, does not show that any part of the accumulations of the taxable years was reasonably needed to carry the business through any bad times which might reasonably have been anticipated during the taxable years. Decision will be entered for the respondent.